Good morning, Your Honors. My name is Greg Lynch, and I'm here representing the Plano Prineville Sawmill. I'm from Bend, Oregon, and I'd like to reserve three minutes for rebuttal, if I may, please. Your Honors. Can you just talk up just a little bit for a second? Thanks. Thank you. This claim is for a breach of contract, and the contract is a settlement agreement. The trial court correctly found that our claim was, in essence, that following the execution of the settlement agreement, the defendant engaged in a course of conduct which was intentionally designed to frustrate the purpose of the agreement and essentially prevent us from performing. The court recognized that there was, in fact, in that contract, as in every other contract, an implied covenant of good faith and fair dealing, and that the covenant were promising one another that they would not do anything to purposely interfere with or intentionally prevent another party from performing or from receiving the fruits of the agreement. Does that mean they have to take product that has more than the requisite part count in it? It does in this case, Your Honor, yes. In fact, the cases in terms of good faith and fair dealing, the Oregon courts have consistently looked at the intentions of the parties and what the expectations of the parties were at the time that they entered into the contract. In this instance, you have two pieces of not only uncontroverted but mutually supporting evidence that establishes without any question at all what the expectations of the parties were at the time that they entered into this settlement agreement. You've I was going to get compensated as consideration for my dismissal of the underlying lawsuit with prejudice, that this is the way that Longview Fiber wanted to pay me. I was going to go along with it. But nevertheless, I had the expectation that I was going to get my money through this vehicle. When you look at Mr. Bowden's testimony, and Mr. Bowden was the senior vice president at Longview Fiber, the architect behind this particular settlement vehicle, he says on page 48 of his deposition, which is ER4065, in response to this question, well, on page 4, there's a paragraph that begins with, with these changes, Chuck, I think that the documents more accurately reflect the expectations of the parties, i.e., that Craig, that would be Craig Woodward, has the unqualified right to sell to Longview, the unqualified right to sell to Longview, 50,000 BVUs of wood chips equal to or better than the quality of chips previously supplied over the past several years at an artificially high purchase price, which allows him to repay the $50,000, excuse me, the $500,000 advance, upgrade his mill, and essentially get him out of the financial hole that he found himself in following Longview's termination of the agreement. I'm not sure what the relevance of this is. They have a contract in 99 that says they're The relevance, Your Honor, is that there was a settlement agreement. You're right. That's what I'm talking about. That was in 1999. Yes, sir. And that provided for a .5% BART limit, right? The settlement agreement had three components. Was that one of them? Yes. There was a BART, there was a chip contract. That's correct. How long had a .5% limit been in the contract between the parties? For the entire time that the parties had a relationship, for over 16 years. Prior to the execution of this settlement agreement, there was the state There was not a change. I'm sorry? There was not a change introduced by the settlement agreement. No, sir. It was really carrying on the prior arrangement. That's correct. Was that in writing, the previous .5%? Absolutely. And that prior contract was in evidence before the court at the time of the argument of the summary judgment motion. The provisions were essentially the same. Now, your claim is that their prior course of dealing gives us the interpretation of what .5% means. My claim is, Your Honor, first of all, that the expectation of the parties is the measure by which the court would conclude whether there has been or has not been a breach of the covenant of faith and fair dealing. I wonder if we could get this a little more directly. The legal theory is that this interpretation of what .5% means is related to their prior dealings. Is that right? Sure. If there was a question as to whether or not the strict enforcement of the .5% bar content was reasonable or unreasonable, arbitrary or capricious, then, yes, you would look to the prior dealings of the parties. And in this instance, in every single contract that the defendant had had with any and every chip supplier, they treated that the same way. At the same time, the testimony of Mr. Bowden, which was part of the summary judgment, proceeding. Excuse me. Mr. Bowden is your opponent? Yes, sir. All right. When you read his statement and his proposition that they expected under the settlement agreement to receive part of the same type they had received in the past? No, Your Honor. What I was saying was, and I didn't get to finish the quote. Could you read that again? Could you read that again? Yes. Because I wasn't clear what that referred to. On the expectation of the parties. Yes. And you're talking about the expectation of your opponent. Of my client. And of the opponent. Yes, the first one is your client. Yes, sir. All right. It was the second one. Yes, that's Mr. Bowden. And this is his deposition testimony. And what did he say? I think that the documents more accurately reflect the expectation of the parties that Craig has the unqualified right to sell to Longview 50,000 BDUs of wood equal to or better than the quality, equal to or better than the quality of the chips previously supplied over the last several years at an artificially high purchase price, which allows him to retake the advance, upgrade his mill, and essentially get him out of the financial hole that he found himself in following Longview's termination of the original agreement. In other words, the process is defined by these documents, the settlement agreement, is in fact the settlement of the claims asserted by Craig and Prineville Saw Mill against Longview Fiber. Is that an accurate recitation of the expectation of the parties as you understand them when we left the room that day? Answer, I believe that's an accurate statement. With respect to the chips, Your Honor, Mr. Bowden's testimony was, question, there was no established protocol with respect to acceptance or rejection of chips other than you would like to get the chips as close to 5% bark content as you could. Is that an accurate statement? Answer, I think the accurate statement is that our chip department works with suppliers trying to keep barks under 1.5% and there's some flexibility in working with them. Question, if the chips exceed 5%, you're going to try to work with the mill to get them to get as close to the 5% as they can, but you still generally buy those chips? Answer, just like we have with Mr. Woodward. In this instance, however, following the execution of the settlement agreement, that is not what they did. Let me get on that road if I could. What happened was that defendant got tough and ultimately your client acceded to tougher standards and testing and inspection and so forth and ultimately it appears did not submit as much product as the contract permitted. We did not accede to voluntarily accept the conditions that were imposed on us by Longview Farm arbitrarily and outside the terms of the contract, but nevertheless, the sum and substance of what they did, the consequence of the changes in the relationship, how they dealt with Prineville Sawmill for 16 years before the execution of this agreement resulted in Prineville's inability to produce enough chips to realize the consideration that it was supposed to get through the settlement agreement. Judge Brown wrote in her order, Oregon law requires the court to apply the contracts, express terms when those terms are inconsistent with the prior course of dealing and she cites Oregon revised statute section 72.2080. That was the argument the defendant advanced was that in a UCC setting, this is the rule, that you can consider the conduct of the parties and the manner by which trade goes on, but if that interferes with an express term in a contract under the UCC, you can't do that. My argument to Judge Brown and to your honors is that that misconstrues the contract that is being sued on in this case. We are suing on a settlement agreement. The settlement agreement is the vehicle by which my client was supposed to have been compensated for the dismissal of the lawsuit that was pending against Longview at the time that they executed the settlement agreement. That lawsuit was claimed in excess of $20 million. Judge Brown denied a motion to strike a letter that was submitted in connection with the supplemental memorandum, my letter, which I read part of to your honor. She denied a motion to strike a settlement agreement in the proper context and she acknowledged that under the Oregon statute 42.220 that it's appropriate for the court to consider the circumstances that exist at the time that the parties enter into a contract so that the court can place itself as well as it can into the position of the parties at the time of the contract. So it's inappropriate and it completely ignores the intent of the parties by Unfortunately, we've used 10 minutes and we haven't gotten to the second issue. Do you want to take a couple of minutes on the second issue? Sure. You bet. The second issue would be? The option of bail and the fairness to provide the title, insurance, the way. Yes. Yes, I will, your honor. And if the plaintiff is vulnerable at all, it would be there. The plaintiff waited and waited to the last day of the exercise to exercise that option. And I assume that what the plaintiff had done prior to the exercise of that option, at the time, in other words, at the time that the parties entered into the agreement, was sufficient to satisfy certain conditions of that option agreement like a list of property site plan and so forth and so on. But nevertheless, there still is the issue in terms of what the parties expected from that option agreement as well. And the one person who testified, the controller for the Longview Fiber, the defendant, was that her understanding was generally that at the end of the contract period, there was an option for the company to buy the chip facility when certain conditions were met. And it would be foolhardy for both parties to expect that Mr. Woodward and his company was going to participate in and continue to chip chips at his plant throughout the period of time that Longview Fiber would like this court to believe that we were supposed to be in there doing an environmental assessment. But my client said in his affidavit, and what was uncontroverted in terms of his expectation nevertheless, was when he was finished chipping, then they would come out, they would do an environmental assessment, and they would find out whether or not there was any contaminants. He did that. He complied with the agreement. I submitted to Judge Brown and to Uranus that with respect to the other conditions relative to the option agreement, that there was substantial compliance. And clearly what he did was within the expectation of the parties at the time they entered into the settlement agreement. Does that answer your question? Well, it's a partial explanation. It's the best I can do with these facts. All right. Thank you, Judge. Thank you. May it please the Court. Tom Sondag on behalf of the Appellee Longview Fiber Company. We believe the Oregon law that controls this case is clear and that its application to the undisputed facts is straightforward. With respect to that law, the covenant of good faith and fair dealing under Oregon law protects the objectively reasonable expectations of the parties to a contract. And those objectively reasonable expectations are discerned from the unambiguous provisions of a contract. Well, you do have a contract. Let's go specifically to some of the evidence that was discussed. There was a letter sent by a plaintiff's lawyer prior to the execution of the settlement agreement. It was read two or three times. It's featured in the brief. It speaks of the expectations product as good as or equal to the product submitted before. Did your client receive that letter? Yes. Our counsel received it. It was sent during the course of negotiating the terms of the settlement agreement. Was the product subsequently offered by plaintiff as good as or equal to or better than the product that was submitted previously that was accepted by your client? Well, we paid for all product that was tendered by prime bill after the 99 agreement was entered into. I would submit if the product that was tendered in the end was better probably, I think. It's very sketchy evidence as to what quality of the product was that preceded the 99 agreement, although there is evidence that there were occasional disputes about part content. But all of the chips that were tendered under the 99 agreement were accepted and paid for by Longview Fiber. Was your client applying different standards? The client was applying the 0.5 percent provision, the half percent provision that's set forth in the 99 agreement. Was that provision set forth in previous agreements? Yes. Well, it was set forth in the 89 agreement. I think it's important to note, though, in reference to that question that the court has asked, that in 1998, the parties modified that agreement. And there's a letter agreement at SER 15-19, I believe it is, in which Longview relaxed the fiber content to 0.8 percent. It's set in that letter. However, we must have chips that meet our quality specifications. Bark content must be kept under 0.8 percent. Now, this was a year before the settlement agreement. It was before the initial lawsuit between the parties. Clearly, the bark content was an issue in the tail end of 98. And with directly answering your question, there were different bark contents in prior agreements between the parties. For a year, it was 0.8 percent. But in the 99 agreement, it was a half percent. And, you know, getting back to what the Oregon law is here, it's really not that different from other jurisdictions. You can't be liable for breach in the implied covenant of good faith and fair dealing by enforcing unambiguous provisions of a contract. Well, but it can be a material breach or a non-material breach. So you have a lot of provisions. And if you have one that says it's got to be 5 percent, but you don't really ever plan on holding people with that, then it would be a non-material breach, even though it would be a breach. Well, that's correct, Your Honor. And I suppose that one could look at this question as to whether we were bringing a claim for breach of contract, which we weren't. I mean, there was no argument made here by us as to whether they were in material breach of the contract. We believe they performed under the chip agreement, and that's why we paid for all of the chips that were tendered. They didn't perform adequately under the option agreement. Plaintiffs made no argument as to whether they were in material or immaterial breach. I think it's clear that they didn't comply with the conditions of that agreement. But as far as enforcing the half percent provision, you know, the contract is unambiguous in that respect. It says that, you know, bar content shall not exceed a half percent. You know, it's important to recognize, I think, that we're settling a dispute here between the parts. I mean, they've been in litigation. And the 99 settlement agreement has an integration clause. It says this is the agreement. This is four-part agreement. This is it. No other prior agreements. It has a disclaimer clause, disclaims all prior representations and promises. It says this is our agreement. And, again, the Oregon law governing the implied covenant of good faith and fair dealing does not permit a party to contradict the unambiguous terms of an agreement. And the terms of this agreement, I think it's undisputed, were unambiguous. You know, in the end, all of the conduct then of which Prime Bill is complaining, you know, whether it's enforcement of the half percent provision under the agreement or enforcement of the unambiguous provisions of the option agreement is conduct that's consistent with the terms of the contract. If it's consistent with the terms of the contract, it cannot be inconsistent with the party's objectively reasonable expectations. If it's not inconsistent with the party's objectively reasonable expectations, there's no violation of the implied covenant of good faith and fair dealing. Just briefly, Your Honor, there was a question concerning the UCC's application here, and I believe that counsel has suggested that the UCC does not apply because this is a settlement agreement. With the issues that are raised on appeal, I don't think that's either here or there because the common law of Oregon, in fact, is as strong or stronger than what 72.2080 provides. The common law of Oregon provides that custom or usage is never admissible except as a means of interpretation. It has often been held by the Supreme Court of Oregon, quote, evidence of a custom inconsistent with the terms of a written agreement is not admissible to contradict the terms of the unambiguous contract. So that's the same law under the UCC as it is under the common law. On the option to sell to users, number two, the option agreement where they tried to sell and the condition is that they didn't close properly by not providing the right documents? Yes. Which documents did the district court rely on that they failed to supply? Well, the court found twofold. First, that they didn't exercise the condition properly. In exercising the condition before the expiration date, which was October 31st of 2000, they had to supply a meets and bounds legal description of the property. They had to provide some other papers. They had to not be in breach of the various agreements. In particular, the court relied on the fact that they did not supply a meets and bounds legal description when they exercised the option. There was a document they contended was a meets and bounds description? They did submit after they purported to exercise the option agreement. They submitted a property description of sorts that was not a meets and bounds description, and the district court so found. Now, if they had exercised timely, if they supplied all the or met the conditions of exercising the option, they then had 10 days to do a number of other things. They needed to supply a preliminary title report showing title in Primeville lumber to the property. They needed to supply a UCC report covering the equipment that would be purchased in the mill. They needed to engage in a full environmental assessment of the property. They needed to do a number of other things. Each of the three things I just recited, there's no dispute. They didn't do them. There was no preliminary title report. There was no UCC report. And the environmental audit that took place, there's undisputed expert evidence that that was not a full environmental assessment of the property. Can I get back to the chips they permitted? I may be confused on the facts, not unusual. I understood you to say that your client accepted all the chips that were tendered. Is that right? Under the 99 agreement, yes, all chips that were tendered were accepted. I thought they claimed that chips were rejected because they didn't meet the BARC requirement. In the first couple of months, in September of 1999 and October of 1999, you're dealing with some performance under the old contract and some performance under the new contract in that time period. There was some back and forth. In particular, for example, and I believe this was a delivery made under the 99 agreement, their own chipper measured the BARC content at very high BARC content levels, and those were initially rejected based on that. They complained. Pineville said, hey, that wasn't a good measurement. The Longview eventually came out to where the chips were, did its own measurement, and decided to take those. So there was some back and forth on that at the front end of the agreement, but all chips eventually were paid for, and if there was any delay in payment, they were made with interest. Now, there was one limited issue that the district court did not grant summary judgment on, which was whether, in fact, there had been full payment made under the agreement. And I won't belabor the issues. It's discussed in the district court's opinion. She felt that the judge felt that there was perhaps an issue of material fact on that issue as to whether there had been full payment. And that was the issue that the parties agreed to voluntarily dismiss with prejudice so that this appeal could proceed. So it's your reading of the record that all chips tendered were paid for? Yes, all chips. What's the relevance of this entire discussion about whether you could reject them, couldn't reject them, whether they met the BARC content or not? Well, I think it goes to the fact that, I believe it was Judge Clifton raised it in questioning counsel, was really what you're complaining about is that some procedures were instituted that prevented you from meeting. There was a $50,000 max unit delivery. They delivered about 36,000, 37,000 units. And their complaint was that, well, you instituted these burdens on us so that we couldn't meet the 50,000 limit. Those burdens were procedures that the parties agreed to after this initial give and take on it. There's an SCR. So they couldn't send you as many chips as they wanted to. But what they sent you, you paid for and accepted. That's correct. Okay, I got you. If there are no further questions, we'll rest. Thank you. If I may, I'd like to quickly explain why the things that Longview Fiber did, which were intended to and did, in fact, interfere with and prevent my client from chipping the number of chips that he otherwise would have chipped and sent to Longview Fiber and received the money. In a chipping business, you have to do the chips. You have to send them to Longview Fiber or the other purchaser. You have to get money to go out to the market and buy more chip logs so that you have a constant supply of chip logs. You can't do that without money. The standard of the industry was when you have a chip contract with a purchaser, they give you advances so you can go out and replenish your chip supply, your chip log supply. In this instance, it's true that Longview Fiber ultimately paid for all the chips, but not until long after the dispute arose, not until they had effectively prevented my client from realizing the benefit of the bargain by not being able to do these chips, by implementing conditions that had never before been implemented, like imposing fines on chips that exceeded a certain bar content, like requiring my client to do 30-minute testing on their chips, which had never been heard of before. Your guy agreed to that, didn't he? No, sir, he did not. They imposed a discipline on him. He did not agree to it. They allege in their brief that we agreed to it. It's also in the record of the district court, and it was not contradicted. Well, it's contradicted in his affidavit. His affidavit said, they imposed these conditions on me. And he never said, I'm not going to do it. He said, this is what we... He had no choice but to do it. I say again, he acceded to it. Well, he acceded to it, but he didn't do it willfully. He did not agree to this. He may have been mad. He may have gone home and stomped on the floor or something, but that's what he agreed to. Well, I disagree with that, Your Honor, respectfully, that he agreed to that. But nevertheless, it's important to note, if I may, and I see that I'm up, but I'd like a minute or so to sum it up. That all of these things that Longview did, which they did not deny, they simply came into court and said, we had the contractual right to do this. What we are saying is, under the circumstances, the circumstances that existed at the time of the execution of this agreement, the circumstances that your senior vice president admitted in his deposition, you did not have the right to impose these standards on us because you'd never done it before. Other than the 1.5 bar content, there are .5 bar content in the contract. There was never any contractual provision that allowed you to do these other things, leave the chips at a barge for two months, not pay us, knowing we were incurring a $10,000 a day cost to chip our logs, and so forth. This case is fact-intensive, and I submit, Your Honor, respectfully, that Mr. Woodward should have the right to have these issues resolved by a jury. Quickly, the things that I wish I had said in response to Your Honor's question about the option, I'll say quickly. Longview Fiber, in the same spirit that they dealt with the chips, reacted to our exercise of our option agreement by, one, objecting to the title company, the only title company that was in Prineville, failing to respond to our choice of an environmental expert, rejected the map, which didn't have specific measurements on it, complained that we had not provided them with a list of personal property that we'd given them at the time of the execution of the agreement, and were objecting to the fact that Prineville Sawmill did not own the mill, but that Mr. Woodward and his wife owned the mill. Mr. Woodward responded by saying we would take care of that at a later time. I have one final question. Yes, sir. The price that we are trying to receive for these chips after the settlement agreement, am I correct that that wasn't the real price, but it was inflated? Absolutely, Your Honor. So that when they first said we don't like the chips, was when they would have had to pay more for the chips, because it wasn't really just a payment of chips, but it was somehow a payment of damages or debts or something? It was the consideration for the release of the, excuse me, the dismissal of the underlying lawsuit with prejudice and the release of claims that Mr. Woodward signed. So they were paying more for the chips than the market price, rather than they were paying other people. They were paying about $60 a BTU more. By limiting the number of chips, they would avoid paying those other amounts as well. Yes, they would. Thank you. Thank you very much. I have $10. Thank you. Thank you both very much. The case is submitted. Thank you. Thank you.  Thank you. Thank you. The last case of the morning is Louisiana Pacific v. Leicester Building.
judges: Reinhardt, Silverman, Clifton